UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
SAFIYYAH SALAHUDDIN,                          NOT FOR PUBLICATION

              *Plaintiff*,

                            **SUMMARY ORDER**

     v.
                            18-cv-7394(KAM)

ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,

              *Defendant*.
----------------------------------X

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), Safiyyah Salahuddin ("plaintiff") appeals the final decision of the Commissioner of Social Security ("defendant" or "Commissioner"), which found that plaintiff was not eligible for disability insurance benefits under Title II of the Social Security Act ("the Act"), on the basis that plaintiff is not disabled within the meaning of the Act.  Plaintiff alleges that she is disabled under the Act and, therefore, is entitled to receive the aforementioned benefits.

        Presently before the court is plaintiff's motion for judgment on the pleadings (ECF No. 17, Pl.'s Mot.), and defendant's cross-motion for judgment on the pleadings (ECF No. 19, Def.'s Mot.).  For the reasons stated below, plaintiff's motion is GRANTED, defendant's motion is DENIED, and the case is remanded for calculation of benefits consistent with this Memorandum and Order.

## BACKGROUND

**I.  Procedural History**

On December 5, 2014, plaintiff Safiyyah Salahuddin
filed an application for disability insurance benefits ("DIB")
alleging that she was disabled due to lordoscoliosis and
herniated discs in the neck and lower back.  (ECF No. 1,
Complaint ("Compl.") 1; ECF No. 20, Administrative Transcript
("Tr.") 332-333, 367.)  The alleged onset of plaintiff's
disability was January 1, 2014.  (Tr. 333.)  Because the
plaintiff requested at the time of her application that she be
considered for all programs available, the Social Security
Administration ("SSA") issued a denial of supplemental security
income ("SSI") under Title XVI of the Act on December 12, 2014,
stating that the plaintiff did not meet the non-medical criteria
for eligibility.  (*Id.* 100-11.)

On March 20, 2015, the SSA also denied plaintiff's
application for DIB on the basis that she was not disabled.
(*Id.* 112-17.)  On March 31, 2015, the plaintiff filed a request
for a hearing before an Administrative Law Judge ("ALJ").  (*Id.*
118-19.)  The plaintiff appeared for a hearing before ALJ Dina
Loewy on November 3, 2016.  (*Id.* 30-46.)  ALJ Loewy adjourned
the hearing at plaintiff's request so that she could retain an
attorney representative.  (*Id.*)  On November 14, 2017, the
plaintiff appeared again before ALJ Loewy with counsel.  (*Id.*

2

47-90.)  On January 25, 2018, ALJ Loewy issued a decision finding that the plaintiff was not disabled.  (*Id.* 9-29.)  The plaintiff requested review of the ALJ decision on February 15, 2018.  (*Id.* 329-31.)  On November 1, 2018, the Appeals Council denied the plaintiff's request for review, thereby making ALJ Loewy's decision the final decision of the Commissioner.  (*Id.* 1-6.)  On December 27, 2018, the plaintiff filed the instant action in federal court. (*See generally* Compl.)

## II.  Medical and Non-medical Evidence

On November 12, 2019, the parties filed a Joint Stipulation of Facts.  (ECF No. 19-1, Stip.)  The court incorporates the parties' stipulation by reference, and proceeds to discuss additional facts pertinent to the court's disposition of the instant motions.

### A. Medical Imaging Studies

On August 5, 2012, plaintiff underwent an MRI, which indicated, *inter alia*, vertebrae slippage, disc hydration loss, disc space narrowing, disc bulge, disc herniation, neural foraminal stenosis, and degeneration of the facet joints. (Stip. 5.)  On January 22, 2015, plaintiff underwent a surgical operation, specifically, a decompressive lumbar laminectomy with medial facetectomies and decompression of neurological elements and nerve roots at the L5 and S1 segments, and a partial discectomy at L5-S1.  (Tr. 711-12.)

From May 29 to June 2, 2015, plaintiff was admitted to Staten Island University Hospital due to worsening low back pain radiating to her buttocks and thigh with numbness and paresthesia (*i.e.*, a burning or prickling sensation). (*Id.* 697.) A physical examination revealed tenderness of the lumbar and paraspinal areas with plaintiff refusing a straight leg raise test. (*Id.*) An MRI of the lumbar spine showed "severe bilateral foraminal stenosis with axillary nerve impingement," with a small left central disk herniation at L5-S1 indenting the ventral sac. (*Id.* 698.)

On July 31, 2015, the plaintiff underwent a lumbar MRI following hospitalization for worsening pain, post surgery. (Tr. 691-92.) The MRI indicated that the plaintiff suffered disc hydration loss, disc space narrowing, and disc bulges at vertebrae abutting and indenting the ventral thecal sac. (*Id.* 691.) The MRI further noted post-surgical changes, including but not limited to broad-based disc herniation, neural foraminal stenoses abutting exiting vertebrae nerve roots, and a ventral disc herniation. (*Id.*) The plaintiff underwent a cervical spinal MRI on November 25, 2015, which indicated that there was loss of hydration in cervical nerves, as well as significant and diffuse disc herniation. (*Id.* 688-89.)

**B. Medical Opinion of Lourdes Esteban, M.D.**

On June 6, 2017, Dr. Lourdes Esteban, M.D., a neurologist, performed an electromyography/nerve conduction velocity study ("EMG/NCVS") on plaintiff's upper and lower extremities, which revealed evidence of mild polyneuropathy (*i.e.*, damage to peripheral nerves) of the distal extremities. (Tr. 1117-19, 1124-26.)  On November 7, 2017, Dr. Esteban completed a Medical Source Statement stating that she had treated plaintiff from May 16, 2017 through October 24, 2017 for "radiculopathy, cervical & lumbar polyneuropathy."  (*Id.* 1155.) Dr. Esteban reported that plaintiff suffered from neck and back pain, and intermittent numbness and tingling in both feet and hands, which was occasionally exacerbated by prolonged sitting and standing.  (*Id.*)  Other symptoms included fatigue, sensory changes, reflex changes, memory loss, dizziness, impaired sleep, weight change, and impaired appetite.  (*Id.* 1156.)  Dr. Esteban further noted that plaintiff's MRI and EMG/NCVS revealed "cervical multi-level disc bulging," "L5/S1 left disc herniation with bilateral foraminal extension w[ith] impingement of both L5 nerves," as well as mild polyneuropathy.  (*Id.* 1156-57.)  The medical records further reflect Dr. Esteban's assessment that depression and anxiety contributed to plaintiff's symptoms. (*Id.* 1157.)  In addition, Dr. Esteban stated that plaintiff's symptoms frequently interfered with her attention and

concentration, and that she had a moderate limitation in her ability to deal with stress.  (*Id.*)

Dr. Esteban concluded that plaintiff could sit for fifteen minutes continuously, but only for less than one hour total in an eight-hour work day; could stand for fifteen minutes continuously, but for less than one-hour total in an eight-hour work day, and would need to rest three hours per day.  (Tr. 1157-58.)  Plaintiff could only occasionally lift up to ten pounds, balance, and stoop.  (*Id.* 1159.)  Dr. Esteban stated that plaintiff would likely miss one day per month if her pain or anxiety were exacerbated.  (*Id.*)  Dr. Esteban originally noted that plaintiff would be off task 10% during a typical work day, but that check mark was subsequently crossed-out with the initials "MM," and replaced with a checkmark indicating that plaintiff would be off task 20% of the time.  (*Id.* 1160.)  Dr. Esteban stated that sitting and standing for a "prolonged period of time" exacerbated plaintiff's symptoms.  (*Id.*)  Finally, Dr. Esteban reviewed the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"), and opined that plaintiff's musculoskeletal impairment met Listing 1.04, entitled Disorder of the Spine, and her neurological limitation met Listing 11.14, entitled Peripheral Neuropathy.  (*Id.* 1161-70.)

**C. Medical Treatment and Opinion of Andrew Merola, M.D.**

On September 13, 2014, the plaintiff saw Andrew Merola, M.D., after she had been involved in a motor vehicle accident. (Tr. 702-03, 1172-73.) Dr. Merola noted plaintiff's complaints of neck and low back pain with numbness, tingling, and pins and needles, with headaches. (*Id.* 702.) Dr. Merola also noted plaintiff had bladder dysfunction, and observed abnormal gait and ambulation, in addition to hunching of the back. (*Id.*) The doctor further noted that an MRI of plaintiff's lumbar spine revealed a herniated disc at L5-S1. (*Id.* 703.)

On January 22, 2015, Dr. Merola performed spinal surgery on plaintiff. (Tr. 711-12.) On January 30, 2015, plaintiff saw Dr. Merola for a follow-up visit. Dr. Merola observed that plaintiff was doing well with no surgical complications. (*Id.* 706.) Dr. Merola ordered no bending, lifting or twisting, and prescribed physical therapy. (*Id.* 706, 1177.) On February 27, 2015, the plaintiff again saw Dr. Merola for postoperative care. (*Id.* 707, 1178.)

Plaintiff followed up with Dr. Merola on June 11, 2015, who noted plaintiff's recent hospitalization. (Tr. 708, 1182). Plaintiff complained of "mechanical axial low back symptoms," and Dr. Merola's physical examination once again revealed abnormal gait and ambulation and hunching of plaintiff's back. (*Id.* 708.) Dr. Merola noted that plaintiff's

lumbar lordosis (lower back curve) reversed itself somewhat with some ambulation, but that certain motions would cause plaintiff severe low back spasms.  (*Id.*)  Dr. Merola suggested a flexion-extension MRI of the lumbar spine. (*Id.*)  On August 14, 2015, during a telephone conversation with plaintiff, Dr. Merola recommended a spinal fusion.  (*Id.* 710.)

On September 25, 2015, plaintiff again saw Dr. Merola, who noted progressively worsening mechanical axial symptoms exacerbated by activity.  (Tr. 699, 709, 1179.)  Upon examination, Dr. Merola observed that plaintiff walked with an antalgic and kyphotic gait.  (*Id.* 709.)  Plaintiff had limitations in range of motion of the lumbar with positive testing for pain, spasm, tenderness, and dysesthesias (*i.e.*, uncomfortable sensations resulting from nerve damage) at various sections of plaintiff's vertebrae.  (*Id.*)  Dr. Merola reviewed plaintiff's July 2015 lumbar MRI and, once again, recommended spinal fusion. (*Id.* 709-10.)

During plaintiff's November 6, 2017 visit, Dr. Merola noted that she had mechanical axial neck and back pain with some pain in the neck radiating to the upper and lower extremities. (Tr. 1180.)  Dr. Merola noted that plaintiff had to strictly modify her activities as a result of her pain.  (*Id.*)  Dr. Merola further observed that plaintiff walked with abnormal gait.  (*Id.*)  Plaintiff had limited ranges of motion in the

cervical and lumbar spines with spasm, decreased sensation and muscle atrophy, though the latter condition was more severe in plaintiff's left side extremities.  (*Id.*)  Dr. Merola again recommended a spinal fusion at L5-S1.  (*Id.* 1181.)  The doctor advised plaintiff to restrict her activities to include neither bending, lifting, nor twisting; and, to continue her medication treatment with Dr. Esteban.  (*Id.*)

### D. Opinion of Consultative Examiner, Sujit Chakrabarti, M.D.

On March 2, 2015, Sujit Chakrabarti, M.D., a consultative physician, examined plaintiff.  (Tr. 635-37.)  Dr. Chakrabarti noted plaintiff's history of back, knee, and hip pain, with possible stress fractures after sustaining injury from a fall in the Army.  (*Id.* 635.)  Dr. Chakrabarti also noted that plaintiff was injured in a car accident in May 2014, with surgery performed by Dr. Merola on January 22, 2015.  (*Id.*)  Plaintiff complained of occasional leg numbness and limitation sitting for thirty to forty-five minutes before changing positions.  (*Id.* 635-36.)  Plaintiff told Dr. Chakrabarti that she drove herself to the examination, has no difficulty standing or moving from room to room, and could sit for up to forty-five minutes at a time.  (*Id.* 636.)  Dr. Chakrabarti noted that plaintiff walks her dogs for several blocks at a time in the mornings and afternoons, goes grocery shopping once a week, and performs her own household chores.  (*Id.*)  Upon examination, Dr.

Chakrabarti observed that plaintiff's gait was normal and she sat comfortably in a chair. (*Id.*)  Plaintiff could squat 50 to 75% of a full range of motion, but she exhibited right knee pain at that time. (*Id.*)  Plaintiff further exhibited good finger dexterity and demonstrated good grip strength. (*Id.*)  Her cervical spine exhibited a full range of motion. (*Id.* 643.) Plaintiff's lumbar spine, hips, and knees each exhibited a limited range of motion, and her straight leg raising tests were positive. (*Id.* 636, 642, 643.)  Dr. Chakrabarti's ultimate prognosis was "guarded." (*Id.* 636-37.)

### E. Opinion of Consultative Examiner Yousif Abdel-Jawad, M.D.

On October 30, 2017, Yousif Abdel-Jawad, M.D., a consultative physician, examined the plaintiff. (Tr. 1184-87.) Dr. Abdel-Jawad noted plaintiff's complaints of sciatica and neuropathy, with herniated disc problems in the cervical and lumbar spines. (*Id.* 1184.)  Plaintiff told Dr. Abdel-Jawad that she could walk for up to one block at a time, and could neither sit nor stand for long periods. (*Id.* 1186-87.)  Dr. Abdel-Jawad's physical examination revealed that: plaintiff's gait was normal; she demonstrated normal muscle strength throughout her arms and legs; she exhibited slightly decreased ranges of motion in the back and lower extremities, with neither joint pain, swelling, nor tenderness; she could not lie flat on the examining table; and straight leg raise tests were positive

10

bilaterally, with reduced deep tendon reflexes in the left knee. (*Id.* 1186.) Dr. Abdel-Jawad diagnosed chronic back and neck pain due to disc disease at multiple levels, peripheral neuropathy in the upper and lower extremities, anxiety and depression, and noted that plaintiff needed a complete psychiatric evaluation for proper and complete prognosis. (*Id.* 1187.)

Dr. Abdel-Jawad found that the plaintiff could lift less than ten pounds occasionally, sit or stand for fifteen to twenty minutes only, and walk one block only. (Tr. 1188.) Dr. Abdel-Jawad stated plaintiff "can't do any" pushing or pulling. (*Id.* 1189.) The doctor stated, "[plaintiff] says she can't do these physical activities because of her back pain and extremities pain and numbness." (*Id.*) Dr. Abdel-Jawad noted that plaintiff can occasionally reach in all directions and handle (gross manipulations of handling, fingering and feeling) due to neuropathy in her extremities. (*Id.* 1189-91.) Dr. Abdel-Jawad stated that, due to plaintiff's back, neck, and limb pain, plaintiff could never climb ramps, stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch and crawl. (*Id.* 1189.) Dr. Abdel-Jawad concluded by stating that plaintiff was limited to exposure to temperature extremes (cold), dust, fumes, odors, chemicals and gases. (*Id.* 1192.)

## LEGAL STANDARD

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

A district court may set aside the Commissioner's decision only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. *Burgess v. Astrue,* 537 F.3d 117, 127 (2d Cir. 2008).  "Substantial evidence is more than a mere scintilla," and must be relevant evidence that a "reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Richardson v. Perales*, 420 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If there is substantial evidence in the record to support the Commissioner's factual findings, those findings must be upheld. 42 U.S.C. § 405(g).  Inquiry into legal error "requires the

court to ask whether 'the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  The reviewing court does not have the authority to conduct a *de novo* review, and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

To receive disability benefits, claimants must be "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(a), (d).  A claimant is disabled under the Act when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Shaw v. Chater*, 221 F.3d 126, 131–32 (2d Cir. 2000).  The impairment must be of "such severity" that the claimant is unable to do his previous work or engage in any other kind of substantial gainful work.  42 U.S.C. § 423(d)(2)(A).  "The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational

background, age, and work experience.'"  *Balodis v. Leavitt*, 704

F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*,

174 F.3d 59, 62 (2d Cir. 1999)).

Pursuant to regulations promulgated by the

Commissioner, a five-step sequential evaluation process is used

to determine whether the claimant's condition meets the Act's

definition of disability.  *See* 20 C.F.R. § 404.1520.  This

process is essentially as follows:

> [I]f the Commissioner determines (1) that the claimant
> is not working, (2) that he has a 'severe impairment,'
> (3) that the impairment is not one [listed in Appendix
> 1 of the regulations] that conclusively requires a
> determination of disability, and (4) that the claimant
> is not capable of continuing in his prior type of
> work, the Commissioner must find him disabled if (5)
> there is not another type of work the claimant can do.

*Burgess*, 537 F.3d at 120 (internal quotation marks and citation

omitted); *see also* 20 C.F.R. § 404.152(a)(4).

During this five-step process, the Commissioner must

consider whether "the combined effect of any such impairment . .

. would be of sufficient severity to establish eligibility for

Social Security benefits."  20 C.F.R. § 404.1523.  Further, if

the Commissioner does find a combination of impairments, the

combined impact of the impairments, including those that are not

severe (as defined by the regulations), will be considered in

the determination process.  20 C.F.R. § 416.945(a)(2).  In steps

one through four of the sequential five-step framework, the

claimant bears the "general burden of proving . . . disability."
*Burgess*, 537 F.3d at 128.  At step five, the burden shifts from
the claimant to the Commissioner, requiring that the
Commissioner show that, in light of the claimant's RFC, age,
education, and work experience, the claimant is "able to engage
in gainful employment within the national economy." *Sobolewski
v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

Lastly, federal regulations explicitly authorize a
court, when reviewing decisions of the SSA, to order further
proceedings when appropriate.  "The court shall have power to
enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."  42 U.S.C. § 405(g).  Remand is
warranted where "there are gaps in the administrative record or
the ALJ has applied an improper legal standard." *Rosa v.
Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v.
Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (internal quotation marks
omitted).  Remand is particularly appropriate where further
findings or explanation will clarify the rationale for the ALJ's
decision. *Pratts*, 94 F.3d at 39.  However, if the record before
the court provides "persuasive proof of disability and a remand
for further evidentiary proceedings would serve no purpose," the
court may reverse and remand solely for the calculation and

payment of benefits.  *See, e.g.*, *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).

## DISCUSSION

### I.   The ALJ's Disability Determination

Using the five-step sequential process to determine whether a claimant is disabled as mandated by 20 C.F.R. § 416.971, the ALJ determined at step one that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2014.  (Tr. 14.)  At step two, the ALJ found that the plaintiff suffered from the severe impairments of anxiety disorder, depressive disorder, degenerative disc disease, degenerative changes of the knees, neuropathy, and obesity.  (*Id.* 14.)  The ALJ noted that the plaintiff was diagnosed with fibromyalgia but found that the record did not contain sufficient evidence to support the diagnosis.  (*Id.*)

At step three, the ALJ determined that, through the date plaintiff was last insured, she did not have an impairment or combination that meets or medically equals one of the listed impairments in Appendix 1 of the regulations, 20 C.F.R. § 404.1520, Appendix 1 (*see* 20 C.F.R. §§ 416.920(d) and 416.926), although the ALJ considered Listings 1.02, 1.04, 11.14, and 12.04.  (Tr. 14-16.)  The ALJ found that through the date last

insured, the plaintiff would be capable of performing "sedentary work, as defined in 20 CFR 404.1567(a)," except as follows:

> [Plaintiff] can never operate foot controls; she can occasionally push and pull; she can never climb ladders, ropes or scaffolds; she can occasional climb ramps and stairs; she can never kneel, crouch, or crawl; she can occasionally balance and stoop; she can frequently reach; she can occasionally reach overhead; she can never perform repetitive extreme neck movement all the way up, down, to the right or to the left; she can frequently handle, finger, and feel; she needs to avoid all exposure to hazardous machinery, operational control of moving machinery and unprotected heights; she is limited to unskilled work (as defined in 20 CFR 404.1568(a)); she cannot perform conveyor belt work; she is limited to low stress jobs defined as having only occasional decision making and changes in the work setting and can have only occasional interaction with the public and coworkers.

(*Id.* 16-17.)

At step four, the ALJ concluded that the plaintiff was not able to perform her past relevant work as a home health aide, or a daycare director. (Tr 21-22.) At step five, the ALJ concluded that the plaintiff was able to perform jobs available in substantial numbers in the national economy, including addresser, document preparer, and surveillance system monitor. (*Id.* 22-23.) As a result, the ALJ concluded that the plaintiff was not disabled within the meaning of the Act, as defined in 20 CFR 416.920(g). (*Id.* 23.)

Plaintiff challenges the ALJ's determination on several grounds. (Pl.'s Mot. 7-18.) First, plaintiff asserts that the ALJ erred in finding that plaintiff did not satisfy the

requirements of any of Listings 1.04 (disorder of the spine),
12.04 (depressive, bipolar, and related disorders), or 12.06
(anxiety and obsessive-compulsive disorders).  (*Id.* 7-12.)
Second, plaintiff argues that the ALJ failed to properly
consider whether plaintiff's spinal disorders and psychiatric
impairments were equivalent to any of the Listings.  (*Id.* 12-
13.)  Third, plaintiff argues that the ALJ failed to accord
proper weight to the opinions of plaintiffs' treating
physicians.  (*Id.* 13-16.)  Lastly, plaintiff argues the ALJ did
not consider whether the plaintiff's impairments, in
combination, rendered her disabled. (*Id.* 16-18.)

## II.  Plaintiff Meets or Equals Listing 1.04

The record before the court warrants the conclusion
that plaintiff has an impairment, which meets or exceeds Listing
1.04(A).  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.
The Act lists particular impairments, "any of which is
sufficient, at step three to create an irrebuttable presumption
of disability." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d
Cir. 1998) (citing 20 C.F.R. 404.1520(d), 416.920(d)).  "The
regulations also provide for a finding of such a disability *per
se* if an individual has an impairment that is 'equal to' a
listed impairment."  *Id.* (citing 20 C.F.R. § 404.1520(d) ("If
you have an impairment(s) which . . . is listed in appendix 1 or
is equal to a listed impairment(s), we will find you disabled

without considering your age, education, and work experience."))
(internal quotation marks omitted); *see also* 20 C.F.R. §
416.920(d).  Accordingly, "[a] claimant is automatically
entitled to benefits if his or her impairment(s) meets the
criteria set forth in Appendix 1 to Subpart P of Part 404. 20
C.F.R. § 404.1520(d) . . . ." *Schneider v. Colvin*, No. 3:13-CV-
00790 MPS, 2014 WL 4269083, at *8 (D. Conn. Aug. 29, 2014)
(quoting *McKinney v. Astrue*, No. 5-cv-174, 2008 WL 312758, at *4
(N.D.N.Y. Feb. 1, 2008)).

Plaintiff bears the burden to present medical findings
demonstrating that his impairments match a listing or are equal
in severity to a listed impairment. *Zwick v. Apfel*, 1998 WL
426800, at *6 (S.D.N.Y. 1998).  In cases in which the disability
claim is premised upon a listed impairment of Appendix 1, "the
Secretary should set forth sufficient rationale in support of
his decision to find or not to find a listed impairment." *Crump
v. Astrue*, No. 706-CV-1003 NAM/DRH, 2009 WL 2424196, at *2
(N.D.N.Y. Aug. 5, 2009) (citing, *inter alia*, *Berry v. Schweiker*,
675 F.2d 464, 469 (2d Cir. 1982)).

### A. Plaintiff Meets Listing 1.04(A)

Listing 1.04 reads, in relevant part:

Disorders of the spine (e.g., herniated nucleus
pulposus, spinal arachnoiditis, spinal stenosis,
osteoarthritis, degenerative disc disease, facet
arthritis, vertebral fracture), resulting in
compromise of a nerve root (including the cauda
equina) or the spinal cord. With:

19

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

Substantial evidence establishes that plaintiff suffers from at least one disorder of the spine under Listing 1.04. MRI results, dated April 17, 2012, indicated plaintiff has herniated nucleus pulposus ("herniated disc"). (Tr. 472, 487, 606.) In 2014, another MRI conducted by Dr. Merola showed herniation at the L5-S1 and C4-C5 segments. (*Id*. 703.) Yet another MRI, from August 2015, showed a herniated disc, which caused proximal neural foraminal stenosis, and which abutted the exiting bilateral L5 nerve roots with facet hypertrophy. (*Id*. 654, 691.) On November 25, 2015, a cervical MRI found, *inter alia*, disc space narrowing from C3/4 through C6/7, bulging/herniated discs at C2/3 and C3/4, and right neural foraminal stenosis at C4/5, C5/6, and C6/7. (*Id.* 652-53; 688-89.) And a June 14, 2017 MRI revealed a disc herniation at L5-S1 with impingement on both L5 nerves, and mild neuropathy. (*Id.* 1129-30.) This evidence is reasonably susceptible to only one interpretation: plaintiff, at a minimum, has a herniated disc or discs.

The record also supports that plaintiff has spinal
stenosis.  Plaintiff's cervical exam and MRI on March 6, 2012
reflected both right and left neuroforaminal stenosis.  (Tr.
473, 628.)  An MRI on August 5, 2012 showed proximal neural
foraminal stenosis. (*Id*. 654, 691.)  A June 2015 MRI of
plaintiff's lumbar spine, administered at Staten Island Hospital
in June 2015, showed "severe bilateral foraminal stenosis with
axillary nerve impingement."  (*Id*. 698.)  And a November 25,
2015 MRI showed right neural foraminal stenosis at C4/5, C5/6,
and C6/7. (*Id*. 652-53; 688-89.)  The record also suggests
plaintiff may have facet arthritis and degenerative disc
disease.  An x-ray on July 28, 2010 showed plaintiff had early
stage facet arthropathy in her lumber spine and the beginning
stages of degenerative spondylosis.  (*Id.* 613.)  On May 25,
2011, plaintiff's primary care physician diagnosed her with
arthropathy. (*Id.* 518.)  A December 10, 2014 MRI likewise showed
facet arthrosis at L3/L4 and L4/L5, as well as degenerative
changes in other spinal areas.  (*Id*. 477-78, 485, 604, 682-83.)

As required by Listing 1.04(A), plaintiff's
aforementioned conditions have resulted in nerve root
compression.  An MRI in August 2012 showed stenosis abutting the
bilateral L5 nerve roots.  (Tr. 654, 691.)  Testing in June 2014
showed pain, numbness, decreased reflexes, and radiculopathy,
all indicative of impact on the C5/6 nerve root.  (*Id.* 730-31,

733-34.)  In January 2015, Dr. Merola conducted lumbar surgery
on plaintiff, which included decompression of neurological
elements and nerve roots at L5 and S1 segments and nerve roots.
(*Id.* 711-12.)  Later, on July 31, 2015, post-surgical
examinations showed continuing proximal neural foraminal
stenosis abutting the bilateral L5 nerve roots.  (*Id.* 654, 691.)

   Finally, the record is replete with evidence that
plaintiff's spinal conditions, and resultant nerve root
compression, have manifested in, among other things, "neuro-
anatomic distribution of pain, limitation of motion of the
spine, motor loss (atrophy with associated muscle weakness or
muscle weakness) accompanied by sensory or reflex loss and, . .
. positive straight-leg raising test[s.]"  Plaintiff's treating
and consultative physicians have consistently assessed and
observed: radiating pain in plaintiff's neck and lower back (*id.*
624-25, 697, 729, 855, 1002, 1180); numbness and or tingling
(*id.* 624-25, 635-36, 853, 1121); limited range of spinal motion
(*id.* 709, 855, 927-36, 1002-03, 1181); and muscle atrophy and
positive straight leg raising tests (*id.* 634, 702, 955, 1036-37,
1180).  The record thus amply supports a finding that plaintiff
meets the requirements of Listing 1.04(A).  The ALJ's finding to

the contrary was highly abbreviated, conclusory, and not supported by substantial evidence.[1]

## B. Remand for Calculation of Benefits is Appropriate

Where the court has no apparent basis to conclude that a more complete record might support the Commissioner's decision, the court may opt simply to remand for a calculation of benefits. *Rosa*, 168 F.3d at 83. Where the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose, a remand for calculation of benefits is appropriate. *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983); *Muntz v. Astrue*, 540 F. Supp. 2d 411, 421 (W.D.N.Y. 2008) (remanding for benefits where the plaintiff met Listing 1.04). The record in this matter provides substantial evidence that plaintiff's impairments satisfied Listing § 1.04(A) of Appendix 1. Because the record provides substantial evidence of disability, a new hearing would serve no useful purpose. Therefore, the court reverses and remands solely for the calculation and payment of benefits. *See Parker v. Harris*, 626 F.2d 225, 241 (2d Cir. 1980).

---

[1]     The court's finding that plaintiff's impairment meets the requirements of Listing 1.04(A) is dispositive in these proceedings, and obviates the need to consider plaintiff's other grounds for appeal.

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment on the pleadings is GRANTED, and defendant's motion for judgment on the pleadings is DENIED.  The court remands this action to the Commissioner solely for the calculation and payment of benefits.  The clerk of court is respectfully directed to enter judgment for the plaintiff and close this case.


**SO ORDERED.**

Dated:     Brooklyn, New York
           July 10, 2020

                              _____/s/_____
                              Hon. Kiyo Matsumoto
                              United States District Judge